# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Caburnay v. Norwegian American Hospital*, 2011 IL App (1st) 101740

---

| | |
|---|---|
| Appellate Court Caption | FERNANDO CABURNAY, Plaintiff-Appellant, v. NORWEGIAN AMERICAN HOSPITAL, an Illinois Not-for-profit Corporation, and PHOENIX ELEVATOR CONCEPTS, INC., an Illinois Corporation, Defendants-Appellees. |
| District & No. | First District, Fifth Division Docket No. 1-10-1740 |
| Filed | December 23, 2011 |
| Rehearing denied | February 22, 2012 |
| Held (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action alleging that the injuries plaintiff suffered when he fell on a mat while waiting for an elevator in defendant hospital were caused by a fold or buckle in the mat and that the hospital was negligent in using and failing to secure the mat, summary judgment was improperly entered for the hospital, because the deposition testimony, viewed in a light most favorable to plaintiff, was sufficient to create an issue of fact as to whether the hospital breached its duty of care to plaintiff; however, summary judgment was properly entered for the hospital on plaintiff's spoliation of evidence claim alleging that the hospital negligently failed to preserve the mat, because its presence would not have been probative of whether a fold existed at the time of the fall. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05-L-013391; the Hon. Mary A. Mulhern, Judge, presiding. |
| Judgment | Reversed in part and affirmed in part. |

Counsel on Appeal

Michael Rathsack, of Chicago, for appellant.

David C. Hall, Timothy J. Shanley, and Hugh C. Griffin, all of Hall, Prangle & Schoonveld, LLC, of Chicago, for appellees.

Panel

JUSTICE J. GORDON delivered the judgment of the court, with opinion.

Presiding Justice Epstein and Justice Howse concurred in the judgment and opinion.

## OPINION

¶ 1   On August 20, 2005, Dr. Fernando Caburnay tripped and fell while waiting for an elevator in the lobby of Norwegian American Hospital (Norwegian), where he worked as an anesthesiologist. Caburnay struck the back of his neck when he fell, rendering him quadriplegic. At the time, the adjacent elevator was being serviced by Phoenix Elevator Concepts (Phoenix). Caburnay sued both Phoenix and Norwegian, alleging that a fold or buckle in the mat caused his fall, and that their negligence in using and failing to secure the mat caused his injuries. Caburnay ultimately settled with Phoenix after Phoenix lost its motion for summary judgment. Norwegian moved for summary judgment and prevailed. Caburnay now appeals.

¶ 2                                    I. BACKGROUND

¶ 3   On the morning of August 20, 2005, Caburnay entered Norwegian's lobby through the emergency room doors and walked down a corridor toward an elevator bank containing two elevators. He was carrying an umbrella in his right hand and a duffel bag over his left shoulder. At the time, the right elevator was fully functional but the left was being repaired by Phoenix. Norwegian had placed a single 6-foot by 10-foot rubber and fabric mat in front of both elevators to protect its floors and to prevent slipping. That mat, or one similar, had been used intermittently in front of the elevators for approximately six months.

¶ 4   As Caburnay approached the right elevator, he walked onto the mat, pushed the elevator call button, and stepped backwards. As he did so, he fell backwards and the back of his head and neck struck a couch adjacent to the elevator. Caburnay fractured his cervical spine, instantly rendering him quadriplegic.

¶ 5   A Norwegian surveillance video indicates that immediately after Caburnay fell, several Norwegian personnel came to Caburnay's assistance. A backboard was placed on the mat and Caburnay was placed upon it. Staff members wheeled a gurney onto the mat, lifted Caburnay onto it, and carried him away. The video does not show Caburnay's feet or the

portion of the mat underneath his feet. Caburnay did not look at the mat, either before or after he fell, because he was looking at the elevator.

¶ 6     In November 2005, Caburnay sued both Norwegian and Phoenix, alleging that their negligence in maintaining the area around the elevator caused him to "slip, trip and fall and thereby injure himself." Caburnay alleged, among other things, that Norwegian "failed to properly, routinely and adequately inspect the floor of the [elevator area] to ascertain whether any dangerous and hazardous conditions existed" and "failed to place a clean and secured floor mat." Caburnay filed his second amended complaint in September 2008, in which he additionally alleged that Norwegian "failed to place a level and secured floor mat on the floor" and "improperly placed the floor mat so that it was subject to become hazardous, movement, wrinkles and folds." Caburnay additionally brought a claim of spoliation of evidence against Norwegian for its failure to produce the mat.

¶ 7     Phoenix moved for summary judgment, based primarily on the deposition testimony of Caburnay, arguing that there was insufficient evidence that a condition of the mat caused his fall. This motion was denied and Phoenix subsequently settled with Caburnay.

¶ 8     After Caburnay filed his complaint, Norwegian served interrogatories upon him. Caburnay objected to most questions on grounds that they were improper and were more appropriate during a discovery deposition. When asked to "describe how the alleged occurrence happened, giving all events in complete detail in the order in which they occurred which had any bearing whatsoever on the occurrence," Caburnay answered:

"Objection, said interrogatory is improper because it is compound question, requests a narrative answer and requests information that is most appropriately the subject of a discovery deposition. Subject to objection, an oral interrogatory at plaintiff arrived at Norwegian American Hospital and slipped and fell while attempting to enter the elevator in the lobby."

¶ 9     On July 16, 2007, Caburnay, in a supplemental Rule 214 (Ill. S. Ct. R. 214 (eff. Jan 1, 1996)) request, requested the production of the mat at issue. Norwegian was unable to produce the mat because it had been destroyed or lost and was not available for inspection. The record indicates that at some time after the accident, Norwegian ceased using its own mats and contracted the job of supplying floor mats to an outside vendor. Norwegian did, however, ultimately produce a mat with a rubber non-slip backing which, despite being smaller in size, was, according to its head of housekeeping, similar to the one at issue here.

¶ 10    After Phoenix settled, the case was assigned to a new judge for trial. On October 15, 2009, Norwegian moved for summary judgment on both the negligence and spoliation claims, arguing that there was insufficient evidence to establish that a condition of the mat caused Caburnay's fall. In support of its motion, Norwegian included the depositions of Caburnay himself as well as several Norwegian and Phoenix employees, including Sophie Serrano, Rosa Cruz, Frank Krause, and Ben Gonzalez.

¶ 11    Caburnay was deposed twice in this case, first for purposes of discovery and again for purposes of evidence. In his first deposition, taken in November 2006, Caburnay stated that he reviewed Norwegian's surveillance video the prior evening, but still recalled the events on the day of his fall before watching that video. When asked by Norwegian's counsel to tell

him what he remembered about what happened the morning of the fall, Caburnay responded "I was walking down the aisle to the elevator door. Then I touched the button for the elevator to come down. Then I fell on my back." When asked if he had a recollection of his feet tripping over anything, Caburnay took a moment to "recall and remember" and then answered "I feel the sole of my shoe got caught in a–it's like a fold from the area rug."

¶ 12 At the close of the deposition, Norwegian's counsel again asked Caburnay about the circumstances of his fall, and the following colloquy occurred:

"Q. You're not certain the fold caused you to fall, isn't that right?

MR. MEYER [Caburnay's counsel]: Objection. I think that's contrary to his testimony.

MR. BLUMENSHINE [Caburnay's counsel]: It's also argumentative.

Q. You can answer.

A. That's what my lawyer says.

Q. He just objected. You still have to answer the question.

MR. MEYER: You want to hear the question again? Would you read it back; Miss Court Reporter.

(WHEREUPON, the Reporter read back the following: 'Q. You're not certain the fold caused you to fall, isn't that right?')

A. I am certain.

Q. You are certain that it caused you to fall, right?

A. Correct.

Q. And that is based on not seeing it, true?

A. Correct.

Q. That's all.

MR. MEYER: And you're certain that the fold caused you to fall because you felt the back of your left foot catch on that fold, correct?

A. Correct."

¶ 13 An evidence deposition of Caburnay was taken in November 2007 in the event that he did not survive his injuries. At that deposition, Caburnay again stated that he felt the sole of his left shoe "get caught in some kind of fold in the mat," but acknowledged that he never saw any fold or ripple before falling. During that deposition, the following colloquy occurred:

"Q. It's your testimony that you fell because the back of your heel or your sole of the shoe got caught on a flap in the carpet and that caused you to trip and fall backwards; is that your testimony?

A. Correct.

Q. And although you never saw that flap or ripple at any time in the rug, as you are here today, sir, that's your assumption of what made you actually fall and trip backwards?

A. Yes."

¶ 14    Later in that deposition, Caburnay added that he felt the fold in the carpet in "the sole of [his] left foot."

¶ 15    Lielani Mindanao, an emergency room nurse, testified in her deposition that she was one of the first to arrive after Caburnay fell. She stated that she looked for something that would have caused Caburnay to fall, but was unable to find any bumps or buckles or anything else in the carpet that may have caused him to do so. She also stated that Caburnay told her that he "slipped on the floor," but that he did not elaborate further. Following the fall, Mindanao carried Caburnay's bag to the emergency room and stated that its weight required her to "lean to the other side" in order to keep her balance while doing so.

¶ 16    Jo Jo Abrahan, an emergency room technician at Norwegian, testified that he observed the mat when he came to Caburnay's assistance and that it looked flat to him. He also walked across the mat several times while rendering assistance, but never felt anything in his feet.

¶ 17    Aura Vega, a member of Norwegian's housekeeping staff, testified that she was cleaning a washroom when she heard a call for help in the lobby. After the fall, she attempted to pick up Caburnay's bag, but it was too heavy for her to do so. She also stated that her duties included making sure the mat was clean and lying flat, and she could not recall receiving any complaints about folds or bumps in the mat prior to Caburnay's fall.

¶ 18    Rosa Cruz, another member of Norwegian's housekeeping staff, testified that in her 17 years working at Norwegian, she could not remember the mat in front of the elevators ever buckling or moving. She also testified that the mat had "rubber on the bottom."

¶ 19    Nicola Basile, an operating room technician who had worked at Norwegian for 36 years, testified that he arrived at the hospital shortly after 7 a.m. on the morning of the accident. He utilized the elevator in the main lobby minutes before Caburnay's fall and did not notice any problems with the mat, nor had he ever seen it bunch or curl up.

¶ 20    Ben Gonzalez, Norwegian's manager of housekeeping from 1991 to 2005, testified that the mat had been placed in front of the elevators at his direction to protect the floors because Phoenix employees were constantly tracking grease throughout the lobby. He stated that the mat had a rubber backing and similar mats were used frequently in the winter or when it was raining. He stated that the mats in front of the elevators had been in use for approximately five years and were often stored in a rolled-up state, which, he said, sometimes resulted in waves or bubbles. He testified that the mats would be checked for waves or bubbles before they were put down, and if any such waves or bubbles existed, he would have ordered the edges of the mat taped to the floor in order to eliminate them.

¶ 21    Frank Krause, a Phoenix mechanic who worked on the out-of-service elevator in Norwegian's lobby for approximately three weeks, testified that on his first day at Norwegian, he tripped on the mat in front of the elevators and spoke with Norwegian personnel about either lengthening it or removing it because his equipment "would bunch up the carpet up" and the mat would "get caught on the barricade and *** was constantly getting moved around and disheveled." Krause also recommended to Norwegian that it tape the edges of the mat, and even did so himself twice, only to have the tape removed by Norwegian's housekeeping staff who needed to clean underneath.

¶ 22    On May 13, 2010, Caburnay filed his response to Norwegian's motion for summary judgment, in which he argued that his deposition testimony, combined with the testimony of his experts, created an issue of material fact as to whether Norwegian was responsible for his fall.

¶ 23    Caburnay relied on the testimony of two witnesses in his motion. The first, Gene Litwin, Caburnay's engineering expert, opined that Caburnay's fall was caused by the mat being untaped, stating that "[i]f they had taped it down with duct tape around the perimeter, I would not have had any other problem with it, and we wouldn't have the accident." He also stated that the mat created a foreseeably dangerous tripping hazard and that Caburnay likely caught his heel on an irregularity in the mat. Litwin, however, admitted that there was "no evidence *** that there was ever a tripping hazard [on the mat] prior to Dr. Caburnay's fall" and that someone could trip on a flat carpet or mat without any folds, ripples, or other defects.

¶ 24    Caburnay's safety expert, Russell Kendzior, testified that floor mats like the one used by Norwegian "buckle and curl all the time. *** Unless they're mechanically fastened, taped down, they buckle. They're prone to buckling." Kendzior opined that the mat buckled or developed some type of elevation, causing Caburnay to trip, but could not state how long the buckle existed. He further opined that the placement of the mat across both elevators was unnecessary, but not negligent, and that the mat violated American National Standards because the "mere placement" of a floor mat is a "potential tripping hazard." Kendzior admitted that someone could trip on a flattened mat if he or she did not lift his or her heel high enough, but that it was unlikely.

¶ 25    The trial court granted summary judgment on both counts, finding that Norwegian was not negligent in using a mat to cover the floor in front of the elevators, nor was there any evidence that it knew the mat had a propensity to fold. The trial court further held, with respect to the spoliation claim, that it was "dubious that [Norwegian] had the duty to preserve the mat" because "no one blamed the mat for this fall until well after the litigation was started" and because "production of the mat is not essential to [Caburnay] being able to prove his case." It is from this decision that Caburnay now appeals.

## II. ANALYSIS

¶ 26

¶ 27    On appeal, Caburnay contends first that the trial court erred in granting Norwegian's motion for summary judgment as to his negligence claim because the evidence he provided created a question of fact as to whether a condition of Norwegian's mat caused his fall. He also contends that the trial court erred in granting summary judgment in favor of Norwegian on his spoliation claim because he adduced evidence that his inability to examine the mat compromised his ability to prove his case. For the reasons that follow, we affirm in part and reverse in part.

### A. Caburnay's Negligence Claim

¶ 28

¶ 29    Caburnay first contends that the evidence that he tripped on a fold or buckle in the mat, coupled with testimony that the mat was negligently employed, created a question of fact that should have resulted in a denial of Norwegian's motion for summary judgment. We agree.

¶ 30    The granting of a motion for summary judgment is appropriate where "the pleadings, affidavits, depositions, admissions, and exhibits on file, when viewed in the light most favorable to the nonmovant, reveal that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Busch v. Graphic Color Corp.*, 169 Ill. 2d 325, 333 (1996). "A defendant moving for summary judgment bears the initial burden of coming forward with competent evidentiary material, which if uncontradicted, entitles him to judgment as a matter of law." *Paul H. Schwendener, Inc. v. Jupiter Electric Co.*, 358 Ill. App. 3d 65, 78 (2005). A defendant does not need to prove its case or disprove its opponent's case in order to prevail on its motion. A plaintiff, however, "must come forth with some evidence that arguably would entitle him to recover at trial" in order to survive such a motion. *Keating v. 68th & Paxton L.L.C.*, 401 Ill. App. 3d 456, 472 (2010). We review a trial court's decision to grant summary judgment *de novo*. *Jupiter Electric*, 358 Ill. App. 3d at 76.

¶ 31    Here, Caburnay contends that the evidence that he felt his foot catch on a fold or buckle in the mat was sufficient to create a question of fact as to whether the mat caused his fall. Norwegian, however, argues that summary judgment was proper because there was no evidence of a fold in the carpet before Caburnay tripped and that "a fair reading" of Caburnay's deposition testimony demonstrates that he had no idea why he fell. For the reasons that follow, we disagree with Norwegian.

¶ 32    In support, Norwegian refers to the colloquy in Caburnay's evidence deposition, as fully set forth in our statement of facts. There, Caburnay was asked "although you never saw that flap or ripple at any time in the rug,*** that's your assumption of what made you actually fall and trip backwards?" Caburnay answered "[y]es." Norwegian cites this answer as evidence that he merely "assumed"or imagined the existence of a fold in the mat. The context in which this answer was forthcoming, however, belies this contention. In the immediately preceding question, Caburnay was asked whether he "fell because the back of [his] heel or [his] sole of the shoe got caught on a flap in the carpet and that caused [him] to trip and fall backwards." Caburnay categorically stated that was correct. This answer is consistent with every other answer Caburnay gave with respect to the cause of his fall. In his discovery deposition, Caburnay indicated that he was "certain" that "the fold caused [him] to fall" and that he physically felt "the sole of [his] shoe got caught in *** a fold from the rug." Similarly, later in his evidence deposition, Caburnay explicitly added that he felt the fold in the carpet in "the sole of [his] left foot." Norwegian, however, asserts that this testimony is inconsistent because Caburnay first testified that he felt the sole of his shoe catch in the mat and later testified that it was either his heel or the sole of the shoe that did so. Even if we were to find this testimony inconsistent, such an inconsistency should affect Caburnay's credibility before a trier of fact, not subject him to summary judgment. See *Allstate Insurance Co. v. Tucker*, 178 Ill. App. 3d 809, 813 (1989) ("an apparent inconsistent statement" from a defendant was insufficient to justify summary judgment because "[i]t is not within the province of the trial court to weigh these conflicting statements" when ruling on motions for summary judgment).

¶ 33    When Caburnay testified that he felt his foot catch in the mat, he was not describing an emotion, but a sensory perception, in the same way that a blind person would describe

something he or she was able to touch but not see. He never testified that it "felt *as if*" he tripped on a fold or that it "*seemed like*" his foot caught a buckle in the carpet, but instead unequivocally testified as to his *sensory* perceptions, describing the tangible, physical sensation of his foot catching on a fold in the mat. Thus, it appears that his affirmative answer to the question of what he assumed did not demonstrate that he was making an assumption as to the cause of his fall, but merely indicated a tactile perception of a fold without an accompanying visual perception,.

¶ 34     For this reason, the cases Norwegian cites in support of its claim are unpersuasive. It relies on *Barker* and *Brett* in support of it's contention that Caburnay was unable to accurately determine the cause of his fall. In these cases, the plaintiffs had no sensory perception of what caused their falls, but instead offered mere cerebral speculation as to their causes. Thus, they are inapposite to the situation here because, as stated above, Caburnay repeatedly and conclusively indicated that he fell only after tripping on a fold or bump in Norwegian's mat.

¶ 35     In *Barker v. Eagle Food Centers, Inc.*, 261 Ill. App. 3d 1068 (1994), the plaintiff slipped and fell on the defendant's floor, but could not say why. She argued that she had often seen water on the floor in the area where she fell, but did not see any on the day of the incident. Despite not seeing where she fell, she "assumed" that the floor was wet because "[o]therwise [she] wouldn't have slipped." (Internal quotation marks omitted.) *Barker*, 261 Ill. App. 3d at 1070. The appellate court concluded that summary judgment was proper because the plaintiff merely assumed that she must have slipped on water because she could not identify any other cause, and thus could not identify the cause of her fall. *Barker*, 261 Ill. App. 3d at 1071.

¶ 36     Similarly, in *Brett v. F.W. Woolworth Co.*, 8 Ill. App. 3d 334 (1972), the plaintiff fell while walking on the defendant's carpet, but was unable to say what caused her fall. The appellate court affirmed summary judgment in favor of the defendant because the plaintiff "did not see or *feel* what caused the fall," and it was undisputed that the mat was in excellent condition. (Emphasis added.) *Brett*, 8 Ill. App. 3d at 337. See also *Koukoulomatis v. Disco Wheels, Inc.*, 127 Ill. App. 3d 95 (1984) (summary judgment in favor of the defendant was proper because plaintiff's assumption that a fold in the defendant's carpet caused her fall was insufficient to create an issue of material fact).

¶ 37     Unlike these cases, here Caburnay repeatedly asserted that he physically felt his foot catch on a tangible fold in Norwegian's carpet, and Norwegian's reliance on certain statements made during his discovery deposition does not in any way reduce their effect. Norwegian, however, contends that ultimately, Caburnay only asserted that his fall was caused by a fold in Norwegian's mat because his attorney instructed him to say so. This contention is based on the following colloquy:

"Q. You're not certain the fold caused you to fall, isn't that right?

MR. MEYER [Caburnay's counsel]: Objection. I think that's contrary to his testimony.

MR. BLUMENSHINE [Caburnay's counsel]: It's also argumentative.

Q. You can answer.

A. That's what my lawyer says.

Q. He just objected. You still have to answer the question.

MR. MEYER: You want to hear the question again? Would you read it back; Miss Court Reporter.

(WHEREUPON, the Reporter read back the following: 'Q. You're not certain the fold caused you to fall, isn't that right?')

A. I am certain."

¶ 38       Norwegian contends that Caburnay's response of "[t]hat's what my lawyer says" indicates that he only said he was certain that he tripped on a fold in the mat because his lawyer instructed him to do so. This interpretation is not the most plausible one. It seems far more likely that this statement was made in response to an instruction from Norwegian's attorney, following an objection, that he could still answer the question, rather than as an abrupt recantation of his earlier testimony. The question was then read back to Caburnay and he responded, twice, that he was certain that a fold in the mat caused his fall. Thus, when read in context, Caburnay's statement "[t]hat's what my lawyer says" would more cogently be intended as a response to the statement of his attorney indicating that he could still answer the question, notwithstanding his objection.

¶ 39       Norwegian further asserts that Caburnay's failure to attribute his fall to a fold in the mat immediately after it occurred proves that his statements amount to speculative guesses as to the cause of his injuries. As stated above, Caburnay told the nurse that came to his aid after the fall that he slipped, but did not elaborate further. He later told the emergency room doctor that he "tripped," but did not attribute it to a fold in the carpet. These statements, made in the moments after a catastrophic injury, while vague or incomplete, are not sufficient to constitute an admission on Caburnay's part that he did not trip on a fold in the mat, nor are they sufficient to preclude us from finding an issue of fact with respect to the cause of his fall, especially when viewed in a light most favorable to Caburnay. Caburnay's failure to specifically mention the mat as a factor in causing his fall, immediately after or within close proximity to its occurrence, would not amount to an admission by silence or omission because Caburnay could not have been reasonably expected to elaborate on the specific cause of his fall just moments after being rendered quadriplegic. See *People v. Zurita*, 295 Ill. App. 3d 1072, 1077 (1998) (an "inconsistency may consist of the failure to speak of a matter entirely when it is shown that the witness had an opportunity to make a statement and that a person would reasonably be expected under the circumstances to do so").

¶ 40       Furthermore, we refuse to accept Norwegian's contention that Caburnay's objections to its interrogatories somehow constitute a failure on his part to "suggest[ ] that his fall was due to a fold in [Norwegian's] floor mat." When asked to describe all the circumstances regarding his fall, he answered, subject to an objection, that he "arrived at Norwegian American Hospital and slipped and fell while attempting to enter the elevator in the lobby." While this response omits specific mention of the mat, it does not contradict Caburnay's later elaboration that he fell due to a fold in the mat. At most, these omissions would raise questions regarding Caburnay's credibility, an issue best resolved by a trier of fact, rather than on summary judgment.

¶ 41 Norwegian further contends that it is entitled to summary judgment because Caburnay did not make specific reference to a fold in the carpet in his initial complaint or his interrogatories. While a party cannot contradict a prior admission in order to create an issue of material fact, we do not find in Caburnay's failure to specifically mention the fold, an admission that no such fold existed. See *Commonwealth Eastern Mortgage Co. v. Williams*, 163 Ill. App. 3d 103, 109 (1987). While Caburnay did not specifically state that a fold in the mat caused him to fall in his complaint, he did generally allege in his complaint that Norwegian's failure to use a "secured floor mat" caused his fall, which is entirely consistent with his deposition testimony. Thus, when viewed in a light most favorable to him, the evidence could well have allowed a jury to conclude that a fold in the mat caused Caburnay's fall.

¶ 42 Having determined that an issue of fact exists with respect to whether the existence of a fold caused Caburnay's fall, we must next determine whether the presence of the fold in the mat was grounds for liability. Norwegian contends that it cannot be held liable, regardless of whether Caburnay proceeds under a premises liability theory or an ordinary negligence theory.

¶ 43 Norwegian contends that under either a premises liability theory or a general negligence theory, it cannot be held liable. Under a premises liability theory, Norwegian could be held liable only if it (1) should have known the mat was unsafe and could have discovered it through the exercise of reasonable care, (2) should have expected Caburnay would not discover the danger, and (3) failed to exercise care to protect Caburnay against that danger. *Deibert v. Bauer Brothers Construction Co.*, 141 Ill. 2d 430, 434 (1990) (quoting Restatement (Second) of Torts § 343 (1965)). Our courts have interpreted this to mean that "there is no liability for [landowners] for dangerous or defective conditions on the premises in the absence of the landowner's *actual or constructive knowledge* [of those conditions]." (Emphasis added.) *Tomczak v. Planetsphere, Inc.*, 315 Ill. App. 3d 1033, 1038 (2000).

¶ 44 Caburnay does not purport to predicate Norwegian's liability under a premises liability theory. Norwegian contends, and Caburnay does not dispute, that it had no actual or constructive notice of the fold in the mat which allegedly caused Caburnay's fall. Therefore, although there may very well be evidence of Norwegian's prior notice of the mat's tendency to fold, we need not address this issue further.

¶ 45 Instead Caburnay asserts that Norwegian is liable under a general negligence theory for placing a mat that was prone to buckling on the floor in front of the elevators. Under a general negligence theory of liability, Norwegian's prior notice of the fold would be irrelevant if Caburnay can show that it created the dangerous condition in the first place by using a mat which could buckle. *Reed v. Wal-Mart Stores, Inc.*, 298 Ill. App. 3d 712, 715 (1998). While a plaintiff generally must prove a defendant's actual or constructive notice of a dangerous condition in order to establish liability (*Genaust v. Illinois Power Co.*, 62 Ill. 2d 456, 468 (1976)), our courts have held that when a defendant creates that dangerous condition, that defendant's notice becomes irrelevant. *Bernal v. City of Hoopeston*, 307 Ill. App. 3d 766, 772 (1999) ("when an affirmative act of a [defendant] causes a dangerous condition, no actual or constructive notice of said condition is required" (emphasis omitted) (internal quotation marks omitted)). All he must prove is that the defendant negligently

created the dangerous condition on its premises. *Reed v. Wal-Mart Stores, Inc.*, 298 Ill. App. 3d 712, 715 (1998). Thus, Caburnay can avoid the notice requirement only if he can establish that the mat was negligently placed in front of the elevator by Norwegian. *Gentry v. Shop 'n Save Warehouse Foods, Inc.*, 708 F. Supp. 2d 733, 737 (C.D. Ill. 2010) ("Plaintiffs can avoid the notice requirement only if they can establish that the mats were *negligently* placed on the floors by the agents of the Defendant, not merely by showing that they were placed by the agents of the Defendant.").

¶ 46     To prevail on a claim of negligence, Caburnay must prove the existence of a duty on the part of Norwegian, and present some evidence showing Norwegian's breach of that duty, and demonstrate injury proximately resulting from that breach. *Wojdyla v. City of Park Ridge*, 209 Ill. App. 3d 290, 293 (1991).

¶ 47     Our courts have held that in the absence of any evidence indicating a mat was in anything less than excellent condition, "[t]he mere use of a floor covering on which an invitee falls is no evidence of negligence." *Brett v. F.W. Woolworth Co.*, 8 Ill. App. 3d 334, 336-37 (1972). In circumstances where "the evidence fails to show any damages or defective condition of the [mat]," a defendant's use of such mats "is perfectly reasonable, and the fact that a person trips on one of them is [not] evidence of negligence." *Robinson v. Southwestern Bell Telephone Co.*, 26 Ill. App. 2d 139, 146 (1960). However, "the condition of the mat and the manner in which it was placed on the floor may constitute negligent placement of the mat on the floor." *Johnson v. United States*, 1999 U.S. Dist. LEXIS 9819, at *10 (N.D. Ill. June 23, 1999). A plaintiff can establish negligent use of a floor mat if he can show that those mats are defective or negligently installed. *Wind v. Hy-Vee Food Stores, Inc.*, 272 Ill. App. 3d 149, 156 (1995). In *Wind*, the appellate court reversed a jury verdict for the defendant-store owner, finding that the jury should have been instructed on a general negligence theory because the evidence indicated that the mat the plaintiff tripped on was poorly maintained and was not fastened to the floor. *Wind*, 272 Ill. App. 3d at 156. Unlike *Wind*, in *Robinson* the court reversed a judgment in favor of the plaintiff, finding that she could not establish defendant's negligence after she admitted that the mat was in excellent condition and was free from debris and rips, and was unable to precisely determine what caused her to trip and fall. *Robinson*, 26 Ill. App. 2d at 141-42.

¶ 48     Here, Caburnay does not dispute the holding in *Robinson* that the ordinary use of a safe mat is not negligent, but instead maintains that case is inapposite because the mat he tripped on, like that in *Wind*, was defective in that it was prone to buckling and not taped down, and therefore Norwegian's use of that mat was negligent. The deposition testimony of Frank Krause, a Phoenix mechanic, supports Caburnay's position. He testified that the mat in question had repeatedly buckled because it was not secured to the floor with tape. He stated that the mat would "bunch up" and become "disheveled" as a result of the work being done on the adjacent elevator, and suggested the mat should have been taped down in order to prevent folds from occurring. Krause's testimony indicates that he actually taped the mat to the floor, but that the tape was repeatedly removed by Norwegian employees so that they could clean the floor underneath it.

¶ 49     Krause's testimony was reinforced by Caburnay's experts, as well as by Ben Gonzalez, Norwegian's manager of housekeeping. Caburnay's experts opined that the mat was unsafe

because it was not secured to the floor with tape, despite being prone to buckling. Gene Litwin testified that if the mat had been taped to the floor, the fold would not have existed and Caburnay would not have fallen. Similarly, Russell Kendzior opined that floor mats "buckle and curl all the time" unless they are taped to the floor. Gonzalez further testified that the mats, like the one at issue here, had developed waves or bubbles in the past after being stored in a rolled up state, and would have to be taped down in order to eliminate those waves or bubbles. It is undisputed that the mat in question was not taped down on the morning of Caburnay's fall. Moreover, we also take note of Caburnay's contention that if the mat was properly used and maintained, his fall would not have occurred. He asserts that the fact that the mat buckled in the first place demonstrates that it was not an ordinary mat with a proper backing, but instead was faulty, and therefore should have been taped down.

¶ 50    Thus, when viewed in a light most favorable to Caburnay, the deposition testimony of Caburnay, Krause, and Gonzalez is sufficient to create an issue of fact as to whether there was a breach of Norwegian's duty of care to Caburnay to properly use a safe and secure mat, by placing a mat that was prone to buckling in front of the elevator without securing it, thus causing him to fall. See *Newsom-Bogan v. Wendy's Old Fashioned Hamburgers of N.Y., Inc.*, 2011 IL App (1st) 092860.

¶ 51    We believe the trial court's reliance upon *Gentry*, a federal district court case, was misplaced as that case is distinguishable from the case at bar. There, the plaintiff slipped and fell after catching her toe on a floor mat in the defendant's store. Witnesses observed a buckle in the mat in the place where the plaintiff fell, but no buckle was seen prior to the fall. *Gentry*, 708 F. Supp. 2d at 733. The plaintiff sued under a general negligence theory, alleging that the defendant essentially failed to properly maintain the floor mats on its premises. *Gentry*, 708 F. Supp. 2d at 736. The defendant moved for summary judgment, which the trial court granted, finding that the plaintiff did not allege any specific facts which could support a finding that the defendant breached a duty. Specifically, the court stated that "the Plaintiffs' allegations of negligence are very generalized. There is no specific act of alleged wrongdoing or unreasonable behavior, leaving it unclear how the Defendant breached their duty." *Gentry*, 708 F. Supp. 2d at 738.

¶ 52    Unlike the plaintiff in *Gentry*, here Caburnay has alleged specific facts regarding how and why the mat was improperly placed. As discussed above, Caburnay's deposition testimony indicates that a fold or buckle existed in the mat at the time of the fall as evidenced by the fact that he felt his foot catch on it, and the testimony of Krause and Gonzalez, coupled with the expert opinions of Litwick and Kenzidor, were sufficient to create a question of fact as to whether Norwegian negligently placed the mat in question in front of the elevator, causing Caburnay to fall. Therefore, summary judgment in favor of Norwegian on this issue was improper.

¶ 53                          B. Caburnay's Spoliation Claim

¶ 54    Caburnay next contends that summary judgment in favor of Norwegian was improper on his spoliation claim because Norwegian negligently failed to preserve the mat, compromising his ability to prove his case. We disagree.

¶ 55    With respect to claims of spoliation, our Illinois Supreme Court has held:

"The general rule is that there is no duty to preserve evidence; however, a duty to preserve evidence may arise through an agreement, a contract, a statute [citation] or another special circumstance. Moreover, a defendant may voluntarily assume a duty by affirmative conduct. [Citation.] In any of the foregoing instances, a defendant owes a duty of due care to preserve evidence if a reasonable person in the defendant's position should have foreseen that the evidence was material to a potential civil action." *Boyd v. Travelers Insurance Co.*, 166 Ill. 2d 188, 195 (1995).

¶ 56    In order to determine whether such a duty existed, we must engage in a two pronged inquiry to "first determine whether such a duty arises by agreement, contract, statute, special circumstance, or voluntary undertaking" and "then determine whether that duty extends to the evidence at issue–i.e., whether a reasonable person should have foreseen that the evidence was material to a potential civil action." *Dardeen v. Kuehling*, 213 Ill. 2d 329, 336 (2004). If a plaintiff fails to satisfy both prongs, then no duty to preserve evidence exists. *Dardeen*, 213 Ill. 2d at 336. If he is able to establish a duty, a plaintiff must still demonstrate "that the loss or destruction of the evidence caused [him] to be unable to prove an underlying suit." (Emphasis omitted.) *Boyd*, 166 Ill. 2d at 196.

¶ 57    Here, Caburnay has presented no evidence of an agreement, contract, statute, special circumstance, or voluntary undertaking which would have imposed a duty to retain the mat. The evidence demonstrates that neither Caburnay nor any of the Norwegian employees who came to his aid specifically mentioned that the carpet was instrumental in Caburnay's fall, although, as discussed above, Caburnay's failure was not sufficient to contradict the mat's role in his fall as was later determined in the pleadings and deposition testimony. Caburnay did not allege that the mat may have been responsible for his fall until filing his complaint approximately 3½ months after his fall, and even then, he only alleged that his fall was a result of Norwegian's failure to "place a clean and secured floor mat," not a fold or buckle in the mat. Finally, Caburnay did not request the preservation of the mat until February 17, 2007, nearly two years after his fall.

¶ 58    Unlike the cases relied upon by Caburnay, here it was not readily apparent that the missing mat was integral to Caburnay's injuries. In *Jones*, *Boyd*, and *Jackson*, upon which Caburnay relies, the defendants were either explicitly placed on early notice before spoliation occurred or voluntarily assumed a duty to retain the evidence and then failed to do so. See *Jones v. O'Brien Tire & Battery Service Center, Inc.*, 374 Ill. App. 3d 918 (2007) (insurance adjuster failed to preserve the wheel assembly that fell off the insured's vehicle and caused the accident given the possibility of future litigation); *Boyd*, 166 Ill. 2d 188 (insurer who took possession of the propane heater which exploded and injured the plaintiff should have preserved it given its potential role in any litigation arising from those injuries); *Jackson v. Michael Reese Hospital & Medical Center*, 294 Ill. App. 3d 1 (1997) (the hospital's loss of the plaintiff's X-rays that it had segregated into a special file after receiving notice of litigation gave rise to a potential spoliation claim).

¶ 59    Here, neither the fall itself nor any witness implicated the mat until 3½ months after it occurred. Thus unlike the plaintiffs in these cases, here Caburnay is unable to establish that

-13-

Norwegian owed him a duty to preserve the mat.

¶ 60 Even if we were to assume that Norwegian owed Caburnay a duty to preserve the mat, at least with respect to the presence of the fold in the mat, Caburnay is still unable to demonstrate "that the loss or destruction of the evidence caused [him] to be unable to prove an underlying lawsuit" because the presence of the rug would have had no bearing on the existence of a fold. (Emphasis omitted.) *Boyd*, 166 Ill. 2d at 196. As the trial court correctly stated:

> "[Caburnay] believes he was certain that he tripped on a fold, and so whether or not the mat was produced is beside the point. If the mat was produced three months later or six months later, its production would not be probative of whether a fold was in that mat at or before the time of Dr. Caburnay's fall. Moreover, *** Russell Kendzior said he had enough information to render an opinion that [Norwegian] was negligent. *** [I]f the mat were produced, it would still not be probative of whether or not the condition of the mat *** existed at the time of this fall."

¶ 61 The evidence shows that the mat was subject to heavy foot traffic, as well as a gurney, immediately following the accident. Even if it had been produced months later upon the filing of Caburnay's suit, it would not have been probative of whether a fold existed at the time of Caburnay's fall. Furthermore, with respect to the mat's rubber backing, the only evidence that the mat lacked a proper, nondefective rubber backing was inferential based upon the existence of the fold in the mat itself. In any event, the sufficiency of this is immaterial because, for the reasons discussed earlier, Caburnay has nevertheless failed to establish Norwegian had a duty to preserve the mat and thus, summary judgment in favor of Norwegian was proper on Caburnay's spoliation claim.

¶ 62                                                   III. CONCLUSION

¶ 63 For the foregoing reasons, we reverse the decision of the trial court granting summary judgment in favor of Norwegian on Caburnay's negligence claim and affirm its grant of summary judgment in favor of Norwegian on Caburnay's spoliation claim.

¶ 64 Reversed in part and affirmed in part.